UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| LISA J.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL NO. 1:20cv454 |
| | ) |
| KILOLO KIJAKAZI, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 423(d). Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity.  *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after a hearing, the Administrative Law Judge ("ALJ") made the following findings:

    1.    The claimant meets the insured status requirements of the Social Security Act

      through December 31, 2022.

2.     The claimant has not engaged in substantial gainful activity since January 2, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: cervical stenosis with disc protrusion; arteriovenous malformation ("AVM"); seizure disorder; diplopia; anxiety; and, major depressive disorder (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: never climbing ladders, ropes, or scaffolds; occasionally climbing ramps and stairs, balancing, stooping, and crawling; must avoid unprotected heights, operation of motor vehicles, and working around or the operation of dangerous machinery with moving parts; can perform simple, routine, and repetitive tasks with no production rate pace like assembly-line work with only occasional simple work-related decisionmaking; can maintain attention and concentration for two-hour segments; and, could respond appropriately to routine changes in the workplace.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on October 28, 1969, and was 48 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 2, 2018, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 23-34).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits, leading to the present appeal.

Plaintiff filed her opening brief on November 16, 2021. On January 27, 2022 the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on February 4, 2022. Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be affirmed.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). In the present case, Step 5 was the determinative inquiry.

Plaintiff is a high school graduate and has past work as a loan officer. Plaintiff has the following severe impairments: cervical stenosis with disc protrusion; arteriovenous malformation (AVM); seizure disorder; diplopia; anxiety; and major depressive disorder. Plaintiff also alleges she suffers from anemia, heart murmur, hypertension, obstipation (a severe form of constipation) , and tobacco use disorder.

Plaintiff states that she worked for many years while coping with her medical impairments and treatments. Although Plaintiff alleged disability beginning January 2, 2018, she offers the following medical summary leading up to her disability onset date.

On August 28, 2002, Plaintiff was recommended to have an embolization of her AVM. (Tr. 590). On August 21, 2004, Plaintiff reported to Fort Wayne Neurological Center (FWNC) that she was experiencing dizziness with difficulty walking, seeing double, lip numbness and tongue tingling, and that she believed it was due to her Trileptal medication. (Tr. 567).

A cerebral angiogram performed on September 8, 2005 revealed residual arteriovenous malformation. (Tr. 540). When it was compared to an MRI from one year previous, it was noted that it did "not appear to have changed that much". (Tr. 542). On October 25, 2005, Plaintiff presented to IU Methodist Hospital for embolization of her arteriovenous malformation (Tr. 525), and on November 15, 2005, Plaintiff presented again to IU Methodist Hospital for arteriovenous malformation radiosurgery. (Tr. 520).

On December 9, 2005, Plaintiff presented to Atiya Khan, MD, and reported having episodes of sudden onset of bilateral arm tingling and reported episodes of waking up from sleep feeling very weak. (Tr. 516).

On December 30, 2005, Plaintiff underwent an MRI of the cervical spine, which found

broad-based central disc protrusion at C3-C4 producing mild canal stenosis; disc bulging and mild canal stenosis at C4-C5; broad based posterior disc protrusion and moderate canal stenosis at C5-C6 with mild bilateral foraminal stenosis; and left paracentral disc protrusion at C6-C7. (Tr. 515).

On April 8, 2008, Plaintiff underwent a cerebral MRI which found patchy venous malformation in the left cingulate gyrus with surrounding encephalomalacia. (Tr. 482). On August 12, 2008, Plaintiff presented to the Dupont Hospital Emergency Department following daily focal motor seizures. (Tr. 468). On August 18, 2008, Plaintiff presented to FWNC where she indicated having recently experienced right sided paresthesia, dizziness, and weakness (Tr. 458) which required a visit to the Dupont ER. (Tr. 461).

On August 7, 2009, Plaintiff underwent an excisional biopsy of the right posterior cervical lymph node at Dupont Hospital, and within the past surgical history note it lists Plaintiff's past AVM procedures, dated July 2002, August 2002, July 2003, again in July 2003, and then radiation in October 2003 and October 2007. (Tr. 416). On December 11, 2009, Plaintiff underwent a cerebral arteriogram, which found very small residual AVM. (Tr. 415).

An April 8, 2010 office note from Goodman Campbell Brain and Spine indicates Plaintiff was experiencing weakness on her right side and was experiencing one episode per week of numbness in her right side. (Tr. 408). On April 22, 2010, Plaintiff presented to FWNC, and her physical evaluation "was significant for mild right-sided hemiparesis". (Tr. 406).

On March 6, 2012, Plaintiff presented to FWNC for auras and occasional left back pain in her lumbar region (Tr. 391), and was found to have cerebral arteriovenous malformation, headaches, and partial seizures with impaired consciousness. (Tr. 391).

On March 12, 2013, Plaintiff presented to FWNC for evaluation of her left parietal lobe AVM and was recommended to have a cerebral angiogram and a brain MRI. (Tr. 930). On April 3, 2013, Plaintiff called into FWNC after experiencing focal seizures throughout the day and she was recommended to take an extra dose of her Topamax. (Tr. 947). She requested to go to the ER but was advised not to drive. (Tr. 947).On May 15, 2013, Plaintiff was seen by Aaron Cohen-Gadol, MD, who noted evidence of regrowth of her AVM on her latest angiogram. (Tr. 916).

On July 25, 2013, Plaintiff reported to FWNC that she was recommended to have open brain surgery for AVM resection. (Tr. 913). On September 12, 2013, Plaintiff underwent a right frontal craniotomy approach for arteriovenous malformation resection by Dr. Aaron Cohen-Gadol (Tr. 304, 298).

On January 21, 2014, Plaintiff presented to Atiya Kahn, MD for evaluation; Plaintiff mentioned that her Topamax was causing fatigue and cognitive issues. (Tr. 904). A note dated June 13, 2014, from FWNC states the following: "It is medically necessary for this patient to have two 10-15 minutes breaks per day". (Tr. 900). On November 20, 2014, Plaintiff presented to FWNC after experiencing numerous spells, during which she would experience right-sided numbness and double vision. (Tr. 896). Plaintiff reported that these spells lasted 15 minutes and left her feeling dizzy and disoriented. (Tr. 896).

On January 4, 2016, Plaintiff was admitted to the ER due to an increase in her seizures, (Tr. 872) where she was assessed as having complex partial seizures with multiple brief breakthrough seizures (Tr. 872), and it is noted that there were concerns for anxiety and depression, that her recent stressors were likely playing a role, as well as possible side-effects from one of her medications, Topamax. (Tr. 872).

Cervical spine MRI results on March 11, 2016, indicated 6-7 discs with moderate foraminal narrowing. (Tr. 854). On May 27, 2016, Plaintiff presented to the Neuro Spine and Pain Center with neck pain and a "sense of pulsation in her head". (848). On September 8, 2016, Plaintiff presented to the Emergency Department for a focal motor seizure on her right side, (Tr. 835), and again on September 24, 2016.(Tr. 824). On September 25, 2016, Plaintiff presented to Parkview Regional Medical Center after experiencing seizure activity, and was subsequently seen by the neurology department, who "felt that her symptoms were likely related to anxiety and pseudoseizures". (Tr. 808).

On November 2, 2016, Plaintiff presented to Cleveland Clinic for management of her seizures, and explained that her seizures were usually at night, but that they had recently been happening during the day, characterized by an inability to walk and weakness that lasts for hours. (Tr. 791). From November 28 to December 5, 2016, Plaintiff underwent a video EEG, which noted several auras characterized by right side paresthesia. (Tr. 787). Plaintiff was also noted to have "significant anxiety" during some of these auras, which would cause Plaintiff to "scream and moan" and request Ativan. (Tr. 787).

On December 15, 2016, Plaintiff presented to FWNC after experiencing a seizure the prior week before, on December 8, 2016. (Tr. 787). During this visit it was noted that Plaintiff was experiencing numbness, and that she had an aura in her right eye that felt like "twitching before her seizure". (Tr. 765).

On May 4, 2017, Plaintiff presented to FWNC for follow-up for seizures and described the days she feels "off" as including dizziness, fatigue, and trouble focusing (Tr. 760), and reported that she was experiencing memory issues at work, particularly difficulty with names. (Tr.

8

760). Also noted was Plaiintiff's ongoing neck pain due to her bulging discs. (Tr. 760).

On July 5, 2017, Plaintiff presented to FWNC for follow-up for seizures and reported having three seizures in one day that consisted of muscle stiffening, double vision, and paresthesia to her right eyebrow and lip. (Tr. 644). A note in the impression section suggests that "not all of her seizure auras are actually seizure related but more likely are anxiety". (Tr. 645).

On July 17, 2017, Plaintiff experienced a seizure and described experiencing double vision, fatigue, disorientation, and balance issues. (Tr. 383). On July 19, 2017, Plaintiff presented to a neurology consultation after experiencing a focal seizure at work. (Tr. 622). A CT was done which noted post-operative changes with encephalomalacia in the left cerebral hemisphere. (Tr. 727). On September 12, 2017, Plaintiff presented to the Cleveland Clinic after experiencing a seizure. (Tr. 378). Plaintiff described developing a heavy, achy, twitching feeling in her right eye, and explained that occasionally she would become disoriented and weak on her right side, would experiencing dizziness, and would sometimes experience double vision. (Tr. 378).

On October 5, 2017, Plaintiff presented to FWNC for follow-up of her seizures, and complained of having four episodes per month, accompanied by right eye diplopia that progresses to right side numbness, loss of focus, and dizziness and fatigue that lasts for several hours afterwards. (Tr. 615).

On November 7, 2017, Plaintiff presented to Parkview Behavioral Health for a psychiatric evaluation, where it is noted that she has a "long history" of seizure disorder (Tr. 361), and that in 2014 she had a craniotomy which she believes resulted in some of her anxiety and memory problems. (Tr. 361). Plaintiff reported that she was still sometimes experiencing tongue and facial

9

numbness along with disequilibrium and mild changes of sensations of her surroundings. (Tr. 361). In the impression section it is noted that these symptoms could be explained by complex partial seizures, and that anxiety might exacerbate her seizure symptoms. (Tr. 364).

The following medical history occurred after Plaintiff's alleged disability onset date. On February 14, 2018, Plaintiff presented to Cleveland Clinic for evaluation of her seizures, which she indicates "began 14 years ago" (Tr. 372), and was found to be consistent with mesial left FP epilepsy. (Tr. 374). On April 12, 2018, Plaintiff presented again to Parkview Behavioral Health for her depression and anxiety (Tr. 367), and described her anxiety about looking for a new job, being fearful that she would lose another job because of her seizures. (Tr. 367). On April 30, 2018, Plaintiff called into FWNC to report that she had lost her job. (Tr. 706).

On July 31, 2018, Plaintiff presented to Parkview Behavioral Health for depression and anxiety and began individual therapy. (Tr. 676).

On August 27, 2018, Plaintiff presented to FWNC for follow-up for her seizures, as they were occurring once per month and included accompanying stiffness and right-side numbness with double vision. (Tr. 696).

On October 3, 2018, Plaintiff presented to J. Rex Parent, M.D., for evaluation, and reported that she was experiencing double vision that happened at random times that was seemingly triggered by light. (Tr. 955). Plaintiff also reported worsening distant vision. (Tr. 955).

On October 26, 2018, Plaintiff presented to the ER for sudden onset of a headache after experiencing a fall two days prior. (Tr. 993). She described hitting her head on the floor, resulting in blurred vision photophobia, and phonophobia, as well as constant neck pain. (Tr. 993).

On November 19, 2018, Plaintiff presented again to J. Rex Parent, M.D., for distorted

10

double vision that would come and go. (Tr. 959). She was diagnosed with diplopia, nystagmus, and lattice degeneration. (Tr. 960).

On January 2, 2019, Plaintiff called into FWNC to report that she experienced two seizures over the course of the night. (Tr. 983).

On January 16, 2019, Pamela McMaster, FNP-C, sent a short letter to Plaintiff's bank stating that: "despite treatment with multiple seizure medications, [Plaintiff] continues to have seizure activity that affects her daily functional ability. This has severely limited her ability to work and she is currently applying for disability." (Tr. 981). This letter was written at Plaintiff's request because Plaintiff needed to withdraw money from her IRA due to her inability to work. (Tr. 982).

On August 29, 2019, Plaintiff presented to FWNC for follow-up, complaining of fatigue and wishing to decrease her Trileptal medication dosage. (Tr. 973). It is noted that her recent episodes were likely non-epileptic in nature, but were rather related to her anxiety. (Tr. 975). It notes, "it does not sound like she is having actual epileptic activity on her current medications". (Tr. 975).

On September 6, 2019, Plaintiff underwent a brain MRI that showed retention cysts at the sphenoid sinuses, and chronic post-procedural changes about the site of the old, resected AVM. (Tr. 970).

A cervical spine MRI on the same day, September 6, 2019, showed mild degenerative changes at the C3-C4 level, as well as spinal and foraminal narrowing at the C3-C4 through the C6-C7 levels, including progression of bilateral foraminal narrowing at the C3-C4 level and progression of left foraminal narrowing at the C5-C6 level, as well as mild degrees of associate

11

nerve root compression at multiple locations. (Tr. 972).

In support of remand, Plaintiff first argues that the ALJ erred in her RFC assessment. Plaintiff's brief is rambling and indecipherable in places, thus it is difficult to ascertain exactly what Plaintiff is contending the ALJ did wrong. At one point, Plaintiff claims that the ALJ gave greater deference to P. McMaster, an NP at FWNC, than to Dr. Jehi, an epilaptologist (specialist in epilepsy) at the Cleveland Clinic, whom Plaintiff claims was "the brains of the whole assessment and operation". (Opening Brief at 16). Plaintiff further states that "the ALJ's deference to McMaster as to etiological explanation is strangely inconsistent considering that the ALJ simultaneously refuses to grant any deference to McMaster's own erstwhile signed report as to functionality. The ALJ's discrediting McMaster's signed functional report seems to be that it extends to an earlier period, *inter alia*, but the ALJ does not wrestle with the underlying medical residuals that make that precise approach eminently sensible from a medical perspective." (*Id*. at 16-17). The Court is at a loss here, but will attempt to address Plaintiff's argument.

Nearly all of the medical records in which Dr. Jehi (or the Cleveland Clinic) was the provider, were for visits or assessments provided in 2016 and 2017, prior to Plaintiff's onset date of January 2018. (*See e.g.* Tr. 790-795, 787, 375-389). The only reference to a visit to the Cleveland Clinic in 2018 is fully discussed by the ALJ. (Tr. 28). Moreover, the ALJ extensively discusses Plaintiff's seizure history and treatment:

> Records from the Cleveland Clinic confirm that the AVM was diagnosed in 2002, and that the claimant subsequently underwent three embolization surgeries and two gamma knife surgeries, with the most recent surgery occurring in September 2013 (resection). EEG performed between November 28, 2016, and December 5, 2016, captured only auras and no seizure activity. At that time, it was noted that symptoms would be treated as "epileptic auras." The most recent instance of treatment at Cleveland Clinic was a virtual visit on February 15, 2018. The record

12

indicates that the claimant reported "significant" personal issues that developed after September 2013, and that she had taken on a new job. Her husband was not sure if reported worsening in symptoms was related to the surgery or to stressors. The claimant, however, reported that with medication changes and her leaving this job, she felt that the changes had "helped tremendously." The claimant indicated that intermittent numbness continued, but that this "never" evolved into motor manifestations, and she confirmed that intermittent fogginess had also improved after quitting her job and starting Effexor. The claimant denied postictal symptoms, and it was noted that the latest angiogram had shown no evidence of residual AVM. Trileptal was decreased, and it was noted that Effexor could be increased, if needed (Exhibit 3F).

The claimant was also receiving neurological treatment at Fort Wayne Neurological Center ("FWN") prior to the alleged onset date; however, only two visits with P. McMaster, FNP (at FWN), since the alleged onset date are in evidence. When seen on August 27, 2018, the claimant reported intermittent seizures, and she confirmed that they had decreased since she had stopped working. The claimant reported having had a seizure two days prior in which she had aura symptoms and her arm and legs were stiff for about five minutes. This resolved with Ativan. Ms. McMaster noted that the claimant was having "brief, mild" seizures one time per month, and that they could include stiffening or "just" right-sided numbness and double vision. The claimant related that she had broken her tibia (it was actually a fibula fracture (Exhibits 9F, 10F)) while camping, and outside of the leg immobilizer, examination was unremarkable. Ms. McMaster indicated that she would consult with neurologist Dr. Bultemeyer for treatment recommendations, and an August 29, 2018, entry reflects that Dr. Bultemeyer advised that the claimant return to the Cleveland Clinic to rule out any surgical options. If surgery was not indicated, it was noted VNS could be considered (Exhibit 10F).

The next office visit took place one year later on August 29, 2019; however, during a phone call on January 2, 2019 (the claimant reported having had two seizures and/or auras), the claimant indicated that she had not called the Cleveland Clinic, but that she had plans to do so. During the August 2019 visit, the claimant reported "aura" symptoms two to three times per week that resolved with Ativan and lying down, and she indicated that right-sided numbness was rare. The claimant reported a recent tibia fracture (records in this regard have not been offered) due to balance issues, and she indicated that prisms were not helping diplopia. However, outside of deficits due to the left foot boot and diminished vibration sense at the right knee, examination remained unremarkable. The claimant was alert, attentive, and in no acute distress, she was fully oriented, and examination of cranial nerves was normal and intact. Tone was normal, strength was 5/5, finger to nose showed no dysmetria, and mood and affect were normal.

13

> Ms. McMaster recorded that recent episodes were likely nonepileptic in nature and related to anxiety, and that it did not sound like the claimant was having "actual epileptic activity." The claimant indicated that she had a video appointment scheduled with the Cleveland Clinic on September 9, 2019, and she was advised to discuss Trileptal during the visit (the claimant believed that it was causing fatigue). She was also advised to follow-up with Dr. Bultemeyer in two months (Exhibit 13F); however, no further follow-up visits with Dr. Bultemeyer or at the Cleveland Clinic have been offered.

(Tr. 28-29).

This Court finds the ALJ's assessment of the evidence to be both complete and accurate. While Plaintiff alleges that the ALJ engaged in cherry-picking and ignored evidence supporting Plaintiff's claim of disability, there is nothing in the record or decision to support Plaintiff's allegation. Nurse Practitioner McMaster's letter to the bank was clearly a courtesy and not a formal assessment of Plaintiff's functional limitations. In fact, the letter does not describe any specific functional limitations whatsoever. (Tr. 981).

Next, Plaintiff argues that "[t]he ALJ rhetorically weighs psyh treater Dr. Shao's conclusion the [sic] 'he could not determine if symptoms were due to complex partial seizures or not['], and rhetorically discounts Cleveland Clinic expert opinion as to significance of video EEG monitoring as if just '[a]t that time'". Plaintiff cites to Tr. 384-85 which describes a video EEG that was taken from November 28, 2016 to December 5, 2016 (long before the alleged onset date) and states: "Many typical events were recorded without any EEG changes. However, her symptoms of right sided numbness are consistent with the known legion [sic] in the left parietal region so will treat as epileptic auras." Again, it is unclear exactly what Plaintiff is attempting to argue here. The ALJ extensively discussed Plaintiff's visits to Dr. Shao:

> As to mental impairment, the State Agency has determined that severe mental impairment is not established, as no more than mild functional limits are

14

confirmed (Exhibits 1A, 3A). Given treatment records, these determinations are not without support, but in granting some deference to the claimant, the Administrative Law Judge is satisfied that a finding of severe mental impairments is supported.

The claimant was seen for a psychiatric evaluation on November 7, 2017, by F. Shao, M.D. The claimant indicated that her neurologist had recommended psychiatry, and she related that "they think I have anxiety that is bringing on seizures, but I don't know." Of note, although the claimant testified that she had been missing "a lot" of work prior to her termination in January 2018, during this evaluation, she reported that she was not missing too much work. The claimant denied panic symptoms and she denied having significant anxiety. She indicated that she "used to be" a little bit irritable, but that with Zoloft, mood was "more contained." While she reported being forgetful over the prior two years and she had word findings difficulties, Dr. Shao recorded that the claimant had no trouble providing accurate information regarding her medical or personal history. The claimant was "well related" and very cooperative, and no agitation was present. Mood was euthymic, affect was bright, and speech was normal. Thought process was goal directed, the claimant was alert and oriented, memory was fair, and judgment and insight were good. Dr. Shao advised that he could not determine if episodic somatic symptoms such as tongue numbness, mild changes of motor skills, and mild changes of possible sensation or consciousness were due to complex partial seizures or "anxiety with somatic complaints," but that symptoms were "very unusual anxiety symptoms." Dr. Shao diagnosed mood disorder due to a general medical condition, adjustment reaction with anxiety, and anxiety, and he continued Zoloft. In addition, Ativan was prescribed (Exhibit 2F).

During follow-up on April 12, 2018, the claimant reported that she had lost her job and she reported conflicts with her husband. She indicated that "some" depression was present due to "acute social stressor," and she stated that she was considering filing for disability due to seizures. Mood was "slightly" anxious and affect was labile, but mental status examination otherwise remained benign. Diagnoses were changed to major depressive disorder and generalized anxiety disorder, but GAF was estimated between 61 and 70, indicating mild symptoms. Individual therapy was strongly recommended, and medication was continued (Exhibit 2F).

Just one additional visit with Dr. Shao has been offered (on July 31, 2018), and the history of present illness and mental status examination notations remained unchanged. In addition, the claimant reported that she had started therapy and that she felt positive about therapy, and "overall status" was noted to be improving. GAF remained 61 to 70, and medications were continued (Exhibit 8F).

As to findings by other treating sources, mood and affect were normal and the

15

>claimant was alert and fully oriented during visits with Dr. Parent (Exhibit 12F). Likewise, Ms. McMaster noted appropriate mood and affect. The claimant was alert and attentive, and she was fully oriented (Exhibits 10F, 13F). During the emergency room visit in August 2018 (due to the ankle injury), mood and affect were normal (Exhibits 9F, 10F). The claimant was unsure of the effect of mental impairments on her ability to work, but she reported that her conditions and auras are stressful. The record strongly suggests that seizure-like activity and/or auras are related to anxiety, and as discussed, the claimant has reported that auras are addressed with Ativan. Symptoms reportedly decreased after the claimant stopped working as a branch manager, and, overall, it appears that the stress of this job, and accompanying responsibility, was too much for the claimant. However, the evidence does not establish mental impairment, including anxiety, that precludes the claimant from performing all work-related activities.

(Tr. 30-31).

Again, the Court finds the ALJ's discussion of the record to be accurate and complete. Although Plaintiff seems to be contending that the ALJ gave greater weight to Dr. Shao than to Dr. Jehi, regarding the cause of Plaintiff's seizures, this Court finds no error in the ALJ's discussion of the record.

Plaintiff also claims that '[n]or does the ALJ opinion adequately wrestle with the role and impact of medications such as Keppra and Trileptal" and notes that, in July 2017 (again, well before the onset date) Plaintiff "endured 5 spells in one day despite medications." (Opening Brief at 18-19).  Plaintiff then states that "[s]ide effects issues alone warrant remand. ... [a]n ALJ must provide reviewable reasons for rejecting testimony concerning side effects...." (*Id*. at 21). However, as the Commissioner points out, all of the evidence Plaintiff relies upon for this argument involves the period between December 2016 and September 2017, an irrelevant time period, as Plaintiff alleged disability beginning January 2, 2018.  Moreover, there is absolutely no evidence that, during the relevant time period, the side effects of Plaintiff's medication would preclude work or require specific limitations in the RFC.

16

Plaintiff further contends that [t]he ALJ fails to account for the lifelong/chronic nature of [Plaintiff's] refractory *epilepsia partialis*, with ongoing daily functional affects." (*Id*. at 23). Plaintiff cites to Tr. 981, which is, as discussed above, the five-sentence letter from NP McMaster of FWNC to Plaintiff's banker, and states, in relevant part: "Despite treatment with multiple seizure medications, she continues to have seizure activity that affects her daily functional ability. This has severely limited her ability to work and she is currently applying for disability."  A related note states that Plaintiff called FWNC and needed a letter to her bank explaining her seizures and inability to work because she needed to withdraw money from her IRA. (Tr. 982). This is hardly the type of evidence the ALJ would be required to give weight to in determining an RFC assessment.  Additionally, Plaintiff does not even hint at what limitations she has that make her incapable of any type of work, or any limitations that should have been, but were not, accounted for in the RFC. *See Reynolds v. Kijakazi*, No. 21-1624, Slip op. at * 7 (7th Cir. February 1, 2022)(remand not warranted where there is no evidence supporting additional limitations in the RFC).

Next, Plaintiff argues that the ALJ's credibility analysis is erroneous.  Plaintiff points out that she still has dizziness and double vision at times, and tires easily. She claims she struggles with simple housekeeping and cannot lift more than a gallon of milk. She states that she does not even walk around the block unsupervised and that Ativan has become a coping tool that makes her tired.   Plaintiff claims that the ALJ failed to weigh these and "other" symptoms.

Clearly, however, the ALJ discussed a whole host of Plaintiff's symptoms, including seizures (and recovery time), difficulty multitasking, problems with memory,  problems with balance, double vision, pain in her neck, right-sided numbness, relying on her husband to cook

17

and clean, and becoming "woozy" after standing for an hour. (Tr. 27-28). The ALJ then found that Plaintiff's symptoms were not consistent with the evidence in the record and spent five pages of the decision discussing the medical evidence, large portions of which have been quoted above. (Tr. 28-32). The ALJ then limited Plaintiff to an RFC providing for a significantly limited range of light work, including a limited range of mental workplace challenges. (Tr. 26, 32).

This Court will not disturb an ALJ's credibility determination unless it is clearly "patently wrong". *Cullinan v. Berryhill*, 873 F.3d 598, 603 (7th Cir. 2017). As the ALJ relied on substantial evidence in reaching her credibility determinations and connected this evidence to her conclusions, there is no basis for remand.

## Conclusion

On the basis of the foregoing, the Decision of the Commissioner is hereby AFFIRMED.

Entered: February 15, 2022.

        s/ William C. Lee
        William C. Lee, Judge
        United States District Court